DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**NOVA SOUTHEASTERN UNIVERSITY, INC.,**
Appellant,

v.

**GARRATT-CALLAHAN COMPANY,**
Appellee.

No. 4D2024-1453

[October 15, 2025]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; John Bowman, Judge; L.T. Case No. CACE18-025817.

Mike Piscitelli and Kristen M. Jimenez of VLP Copenhaver Espino, Fort Lauderdale, and Thomas F. Panza and Richard A. Beauchamp of Panza Maurer & Maynard, P.A., Fort Lauderdale, for appellant.

Michael R. Holt, M. Stephen Smith, and Katherine V. Becerra of Rumberger, Kirk & Caldwell, P.A., Miami, for appellee.

LEVINE, J.

Nova Southeastern University ("NSU") appeals an order awarding NSU $176,948 in attorney's fees and $46,862 in costs against Garratt-Callahan Company ("G-C"). NSU argues that it was entitled to additional attorney's fees because its claims against two additional defendants, who settled, were inextricably intertwined with its claims against G-C. NSU also argues it was entitled to present additional evidence, for the first time, supporting allocation of attorney's fees after the trial court found the claims were not inextricably intertwined. Finally, NSU challenges the striking of time entries due to block billing, vague entries, and duplicative entries. We find no error. The claims were not inextricably intertwined, the trial court did not err in declining to consider allocation evidence first presented in a motion for reconsideration, and competent substantial evidence supports the amount of fees awarded. Thus, we affirm on all issues.

In 2018, NSU sued three defendants: Brady & Anglin Consulting Engineers ("B&A"), South Florida Water Consultants ("SFWC"), and G-C. According to the complaint, NSU constructed a facility to provide air

conditioning on its campus. The facility included large ice tanks which stored and chilled the water, which was then circulated to the adjacent buildings as a source of cooling.

B&A was employed as the mechanical engineer for the project and designed the system. Subsequently, SFWC became the consultant overseeing the treatment and maintenance of the water and water systems contained in the ice tanks. G-C later replaced SFWC as the consultant overseeing the treatment and maintenance.

The service agreements with SFWC reflected a term from July 1, 2013 through June 20, 2015. The agreements required SFWC to "furnish all the water quality testing and treatment services to ensure and maintain optimum operation of NSU's chilled water air conditioning systems."

The service agreement with G-C commenced on January 1, 2016. The agreement incorporated a bid proposal, which reflected G-C's obligation "to supply a high quality water chemical treatment service program to maintain peak operating efficiencies, with no deposition, corrosion, and biological growth prevention." The proposal included detailed pages of specific water treatment services, encompassing areas of chemical feed and monitoring equipment, equipment inspection, various corrosion inhibitors, steam boiler treatment, corrosion monitoring, microbiological control, biocide treatment, chemical delivery, salt delivery and application, water/coupon/deposit analysis, and on-site service requirements.

The complaint alleged that, over time, NSU became aware of a degradation in the appearance of the water solution in the ice tanks. Eventually, the ice tanks suffered from rampant biological growth. According to NSU, "[t]his growth was a result of both problems with the original design provided by B&A and shortcomings in the water treatment services provided by" SFWC and G-C. NSU alleged the biological growth resulted in a loss of efficiency, a substantial increase in NSU's cost to generate electricity, and a reduction in the life expectancy of certain ice tank components.

NSU stated a claim against B&A for professional negligence based on B&A's defective and deficient design. NSU also stated claims against SFWC and G-C for breach of contract and professional negligence. The breach of contract claim against SFWC alleged that it was "responsible for ensuring and maintaining optimum operation of NSU's chilled water air conditioning system." The breach of contract claim against G-C alleged that it "was responsible for meeting the contract objective of supplying a high quality water chemical treatment program to maintain peak operating

2

efficiency with no deposition, corrosion or biological growth." The complaint further alleged that SFWC and G-C breached their contractual obligations by "allow[ing] rampant biological growth to develop in the ice tanks."

SFWC and NSU reached a settlement, resulting in SFWC's dismissal from the case. Following non-binding arbitration, an arbitrator found liability on the part of both remaining defendants. The arbitrator awarded NSU $3 million, with 30% to be paid by B&A and 70% to be paid by G-C. No party objected to the arbitrator's decision. Following a motion by NSU, the trial court confirmed the arbitration award and issued final judgment. The trial court ruled that NSU was the prevailing party and entitled to an award of fees and costs pursuant to the contract. Meanwhile, B&A and NSU reached a settlement, leaving G-C as the sole remaining defendant.

NSU moved for attorney's fees and costs against G-C pursuant to the contract between NSU and G-C. NSU also sought the inclusion of fees relating to the two defendants who settled, claiming that the "issues relating to all defendants were significantly intertwined" because the case "concentrated on a 'common core of facts' relating to the design, treatment and maintenance of the chilled water system."

At a hearing, NSU's lead counsel testified that attorney's fees incurred among all three defendants were inextricably intertwined. NSU's attorney's fees expert opined that the billing entries did not contain block billing, vague, or duplicative entries. Nevertheless, as a "concession," NSU's expert reduced the amount sought by 10% for block billing and by 5% for vague and duplicative entries. Based on these deductions, NSU sought $1,252,077.30 in fees for lead counsel, $28,627.94 in fees for general counsel, and $177,107.16 in costs.

G-C's attorney's fees expert testified that the claims against the three defendants were not inextricably intertwined for several reasons, including that the claims alleged in the complaint were different. The claim against B&A was for professional negligence in connection with the design of the chilled water system and tanks, whereas the claims against SFWC and G-C were for breach of specific service agreements and negligence.

Additionally, the expert testified that the obligations under the service agreements with G-C and SFWC were different. The actual service agreement with G-C was more extensive and included a proposal with the specific scope of work. Further, the time periods of performance were different. SFWC provided services from 2009 through 2015, with a contract lasting two years from the summer of 2013 to 2015. Thereafter,

3

G-C took over the consulting services in 2016.

G-C's expert further testified that the conditions under which SFWC and G-C performed their obligations were vastly disparate under their respective service agreements. There was a massive contamination at the point in time that SFWC performed its obligations under the agreement. G-C inherited that contamination when it signed its agreement in 2016.

G-C's expert concluded that NSU was responsible for allocating its fees among the various claims. G-C's expert went through the billing entries, which were not allocated, and marked entries unrelated to pursing the claim against G-C. He also marked entries that constituted block billing, vague entries, and double billings. G-C's expert opined that NSU was entitled to $161,731 for fees incurred by lead counsel and $9,217 for fees incurred by general counsel.

The trial court ultimately found that NSU's claims were not inextricably intertwined and that NSU was required to allocate its fees against G-C, which it had not done. The trial court found that the differences between the scope of work in the service agreements with SFWC and G-C were "readily apparent." SFWC's service agreement required it to "furnish all the water quality testing and treatment services to ensure and maintain optimum operation of NSU's chilled water air conditioning services." In contrast, G-C's service agreement included a bid package which specifically set forth G-C's scope of work. G-C was obligated to "meet the contract objective of supplying a high-quality water chemical treatment program to maintain peak operating efficiency with no deposition, corrosion or biological growth" in the ice tanks serving the chilled water system. The inclusion of the bid package document in the service agreement with G-C, but not with SFWC, made the services agreements, and the obligations and responsibilities, "distinctly different."

The trial court concluded that the claims against SFWC and G-C were not inextricably intertwined because (1) the terms and conditions and the scope of work under the service agreements were different, (2) the periods of performance were different, and (3) the conditions under which performance occurred were different. Additionally, "the claims by NSU against B&A and G-C for breach of contract on their respective written agreements were different than NSU's claim against B&A for professional negligence." The trial court awarded a total of $176,858 in attorney's fees, consisting of $167,731 in fees to NSU's lead counsel and $9,127 in fees to NSU's general counsel, and $46,862.13 in costs.

NSU moved for reconsideration, arguing that it should be permitted to

allocate its attorney's fees following the trial court's determination that NSU's fees were not intertwined. NSU submitted a lengthy affidavit in support of its motion, which provided, for the first time, an allocation identifying those portions of the billings which were attributable to the claims against G-C. NSU claimed that this allocation, performed by NSU's counsel, supported an award of $885,916.40. The trial court denied the motion for reconsideration. This appeal follows.

NSU argues the trial court erred in finding NSU's fees were not inextricably intertwined, claiming that each defendant affirmatively caused all of NSU's damages and that each defendant blamed the other.

Although an award of attorney's fees is generally reviewed for an abuse of discretion, a trial court's determination whether claims are inextricably intertwined is reviewed de novo. *Carl Domino, Inc. v. Dixon*, 413 So. 3d 157, 165 (Fla. 4th DCA 2025).

"[T]he party seeking fees has the burden to allocate them to the issues for which fees are awardable or to show that the issues were so intertwined that allocation is not feasible." *Effective Teleservices, Inc. v. Smith*, 132 So. 3d 335, 339 (Fla. 4th DCA 2014) (quoting *Chodorow v. Moore*, 947 So. 2d 577, 579 (Fla. 4th DCA 2007)). "Claims are 'inextricably intertwined' when a 'determination of the issues in one action would necessarily be dispositive of the issues raised in the other.'" *Anglia Jacs & Co. v. Dubin*, 830 So. 2d 169, 172 (Fla. 4th DCA 2002) (citation omitted). "In other words, where the claims involve a 'common core' of facts and are based on 'related legal theories,' a full fee may be awarded unless it can be shown that the attorneys spent a separate and distinct amount of time on counts as to which no attorney's fees were sought." *Id.* (citation omitted). In contrast, "claims are separate and distinct when they could support an independent action and are not simply alternative theories of liability for the same wrong." *Avatar Dev. Corp. v. DePani Constr., Inc.*, 883 So. 2d 344, 346 (Fla. 4th DCA 2004).

We find that the trial court did not err in finding that the claims against the defendants were not inextricably intertwined. The claim against B&A was for professional negligence based on B&A's defective and deficient design. In contrast, the claims against SFWC and G-C were for breach of contract and professional negligence relating to servicing the system. Additionally, SFWC and G-C had different servicing contracts with NSU that encompassed different periods of time and imposed different obligations. The agreement with SFWC required it to "furnish all the water quality testing and treatment services to ensure and maintain optimum operation of NSU's chilled water air conditioning systems." In contrast,

the agreement with G-C included a bid proposal, which reflected its obligation "to supply a high quality water chemical treatment service program to maintain peak operating efficiencies, with no deposition, corrosion, and biological growth prevention." The proposal included detailed pages of specific water treatment services, encompassing areas of chemical feed and monitoring equipment, equipment inspection, various corrosion inhibitors, steam boiler treatment, corrosion monitoring, microbiological control, biocide treatment, chemical delivery, salt delivery and application, water/coupon/deposit analysis, and on-site service requirements. As G-C's expert testified, there was a massive contamination during the time that SFWC performed its obligations under the agreement. As a result, G-C inherited that contamination when it signed its agreement in 2016.

The claims would only be inextricably intertwined where a "determination of the issues in one action would necessarily be dispositive of the issues raised in the other." *Effective Teleservices*, 132 So. 3d at 339 (quoting *Anglia Jacs,* 830 So. 2d at 172). Since a finding that B&A negligently designed the system would not necessarily have any bearing on whether G-C or SFWC breached their respective contracts or were negligent, then these claims, as a result, would not be intertwined. Similarly, a finding that SFWC breached its contract or negligently maintained the system would not necessarily be dispositive as to whether G-C breached its contract or negligently maintained the system, which occurred after SFWC's maintenance term. The claims were "separate and distinct" because "they could support an independent action and are not simply alternative theories of liability for the same wrong." *Avatar Dev.*, 883 So. 2d at 346. Like in *Effective Teleservices*, the claims "arose at different times, against different parties, sought different damages, were based on different legal theories, and provided for attorneys' fees for only some of the claims." 132 So. 3d at 340-41.

Alternatively, NSU argues that it should have been allowed to allocate its fees after the trial court's determination that the fees were not intertwined. Therefore, NSU argues the trial court erred in denying its motion for rehearing which contained, for the first time, an affidavit allocating fees.

"A trial court's decision on a motion for rehearing is reviewed for abuse of discretion, as is a trial court's refusal to consider late affidavits filed with a motion for rehearing." *Muth v. AIU Ins. Co.*, 982 So. 2d 749, 752 (Fla. 4th DCA 2008). "The purpose of a motion for rehearing is to give the trial court an opportunity to consider matters which it overlooked or failed to consider . . . and to correct any error if it becomes convinced that it has

erred." *Id.* (citation and internal quotation marks omitted).

In *Muth*, this court found the trial court did not abuse its discretion in denying a motion for rehearing "where appellant first submitted her affidavit to rebut the presumption of prejudice to AIU when she filed her motion for rehearing and, further, failed to show any compelling reasons or exigent circumstances to excuse the affidavit's tardiness." *Id.* Like in *Muth*, in the present case, NSU first submitted an affidavit regarding allocation only when it filed a motion for reconsideration and, further, "failed to show any compelling reasons or exigent circumstances to excuse the affidavit's tardiness." *Id.* Thus, the trial court did not abuse its discretion in denying the motion for reconsideration.

Finally, NSU argues G-C's striking of entire time entries, regardless of whether they contained tasks related to G-C, was not supported by law.

A trial court's decision whether to reduce a fee award is reviewed for abuse of discretion, and affirmance is warranted where competent substantial evidence supports the trial court's findings. *See Spanakos v. Hawk Sys., Inc.*, 362 So. 3d 226, 242 (Fla. 4th DCA 2023).

"[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). "Inadequate documentation may result in a reduction in the number of hours claimed, as will a claim for hours that the court finds to be excessive or unnecessary." *Fla. Patient's Comp. Fund v. Rowe*, 472 So. 2d 1145, 1150 (Fla. 1985). "The applicant should exercise 'billing judgment'" and "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Hensley*, 461 U.S. at 437. In awarding attorney's fees, the court should exclude hours that were not "reasonably expended." *Id.* at 434. Such reductions include "hours that are excessive, redundant, or otherwise unnecessary." *Id.*

The trial court did not abuse its discretion in reducing the amount of fees NSU sought based on the testimony of G-C's attorney's fees expert. G-C's expert went through NSU's billing entries and marked entries that involved block billing, vagueness, and duplicative billing. NSU was not entitled to fees for these types of entries. *See Spanakos*, 362 So. 3d at 241-42 (finding block billing and duplicative entries are not compensable); *Van Diepen v. Brown*, 55 So. 3d 612, 614 (Fla. 5th DCA 2011) (finding no entitlement to fees for vague charges).

Indeed, NSU's own attorney's fees expert conceded that a reduction was

warranted for block billing, vague entries, and duplicate entries. NSU's expert proposed a reduction of 10% for block billing, and a reduction of 5% for vague and duplicate entries. However, such a blanket percentage reduction is insufficient and also constitutes reversible error. *See Universal Prop. & Cas. Ins. Co. v. Deshpande*, 314 So. 3d 416, 420 (Fla. 3d DCA 2020) (reversing where the trial court adopted the plaintiff's fee expert's 10% blanket reduction to the number of hours expended); *accord Citizens Prop. Ins. Corp. v. Casanas*, 336 So. 3d 746, 748 (Fla. 3d DCA 2021).

In summary, the claims against the defendants were not inextricably intertwined, evidence of allocation was only first belatedly presented in a motion for reconsideration, and competent substantial evidence supports the amount of the attorney's fee award. As such, we affirm.

*Affirmed.*

CIKLIN, J., and HARPER, BRADLEY G., Associate Judge, concur.

*     *     *

**Not final until disposition of timely-filed motion for rehearing.**